---

### APPEAL NO. 13-4806

---

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

Appellee,

v.

## ERIC BARKER,
## MEGAN DUNIGAN,
## ROBERT HILL (L)

Appellant.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

---

**BRIEF OF APPELLANT ERIC BARKER, MEGAN DUNIGAN, ROBERT HILL (L)**

---

**BRIAN J. KORNBRATH**
Federal Public Defender
The Huntington Bank Building
230 West Pike Street, Suite 360
Clarksburg, West Virginia 26301
Tel. (304) 622-3823
Fax. (304) 622-4631
Counsel for Appellant, Eric Barker

**ROGER D. CURRY, ESQ.**
Curry, Amos, and Associates
PO Box 3040
Fairmont, WV 26555
Telephone: 304-368-1000
Counsel for Appellant, Megan Dunigan

**ANDREW B. GREENLEE, ESQ.**
Brownstone Law Firm
201 N. New York Avenue; Suite 200
PO Box 2047
Winter Park, Florida 32790
Telephone: 407-388-1900
Counsel for Appellant, Robert Hill

---

## APPEAL NO. 13-4806

---

UNITED STATES COURT OF APPEALS  FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

ERIC BARKER,
MEGAN DUNIGAN,
ROBERT HILL (L),

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

---

**BRIEF OF APPELLANT ERIC BARKER, MEGAN DUNIGAN, ROBERT HILL (L)**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i-ii

STATEMENT OF JURISDICTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-3

ISSUE PRESENTED FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-13

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15-26

        **I.**    **FOLLOWING DEFENDANTS' ARRESTS FOR SUPERVISED RELEASE VIOLATIONS, AND AFTER CONDUCTING A PROTECTIVE SWEEP OF THE RESIDENCE, THE POLICE ACTED ILLEGALLY BY INVITING U.S. PROBATION INTO THE RESIDENCE AND TOGETHER CONDUCTING A WARRANTLESS SEARCH OF THE RESIDENCE.**

             **A.**    **Standard of Review.**

             **B.**    **Argument.**

        **II.**   **U.S. PROBATION ACTED ILLEGALLY IN ORDERING A WARRANTLESS POLICE SEARCH OF THE RESIDENCE WITH A DRUG SNIFFING DOG.**

             **A.**    **Standard of Review.**

             **B.**    **Argument.**

**III.    EVIDENCE SEIZED PURSUANT TO A SUBSEQUENT SEARCH WARRANT SHOULD BE SUPPRESSED BECAUSE THE POLICE WOULD NOT HAVE APPLIED FOR THE SEARCH WARRANT ABSENT FRUITS OF THE EARLIER ILLEGAL SEARCHES.**

    **A.    Standard of Review.**

    **B.    Argument.**

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

REQUEST FOR ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

## CASES

<u>Florida v. Jardines,</u> – U.S. –, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). . . .  22,23

<u>Griffin v. Wisconsin,</u> 483 U.S. 868, 107
       S.Ct. 3164, 97 L.Ed.2d 709 (1987). . . . . . . . . . . . . . . . . . . . . .  15,16,17,20

<u>Katz v. United States,</u> 389 U.S. 347, 357, 88
       S.Ct. 507, 19 L.Ed.2d 576 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . .  21,22

<u>Mincey v. Arizona,</u> 437 U.S. 385, 98
       S.Ct. 2408, 57 L.Ed.2d 290 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Murray v. United States,</u> 487 U.S. 533, 537-43, 108
       S.Ct. 2529, 101 L.Ed.2s 472 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Payton v. New York,</u> 445 U.S. 573, 586, 100
       S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Samson v. California,</u> 547 U.S. 843, 126
       S.Ct. 2193, 165 L.Ed.2d 250 (2006). . . . . . . . . . . . . . . . . . . . . . . . .  16,17

<u>United States v. Allen,</u> 631 F.3d 164 (4th Cir. 2011). . . . . . . . . . . . . . . . .  24,25

<u>United States v. Bullard,</u> 645 F.3d 237, 244 (4th Cir. 2011). . . . . . . . . . . . . . . 26

<u>United States v. DiCesare,</u> 765 F.2d 890 (9th Cir. 1985). . . . . . . . . . . . . . . . 22

<u>United States v. Henry,</u> 429 F.3d 603, 617-618. (6th Cir. 2005). . . . . . . . . .  18,19

<u>United States v. Knights,</u> 534 U.S. 112, 122
       S.Ct. 587, 151 L.Ed.2d 497 (2001). . . . . . . . . . . . . . . . .  11,12,14,16,17,18

<u>United States v. LeBlanc,</u> 490 F.3d 361, 367 (5th Cir. 2007). . . . . . . . . . . . . . 18

United States v. Leon, 468 U.S. 897, 104
    S.Ct. 3405, 82 L.Ed.2d 677 (1984)................................. 26

United States v. Mowatt, 513 F.3d 395, 404 (4th Cir. 2008)............... 26

United States v. Place, 462 U.S. 696, 103
    S.Ct. 2637, 77 L.Ed.2d 110 (1983)................................. 22

United States v. Reyes, 283 F.3d 446, 462 (2nd Cir. 2002)................. 18

United States v. Sanchez, 608 F.3d 685, 688 (10th Cir. 2010). ............. 18

United States v. Scheetz, 293 F.3d 175, 182 (4th Cir. 2002)............ 15,20

United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).............. 23

United States v. Swope, 542 F.3d 609 (8th Cir. 2008). ................... 26

United States v. Whitehead, 849 F.2d 849, 858 (4th Cir. 1988). ........... 22

United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir, 2005)......... 12

## STATUTES

18 U.S.C. § 2 ............................................................ 1,4
18 U.S.C. § 3231 ......................................................... 1
21 U.S.C. § 841(a)(1)..................................................... 1,4
21 U.S.C. § 841(b)(1)(c) ................................................. 1,4
21 U.S.C. § 846.......................................................... 1,4
21 U.S.C. § 856(a)(2)..................................................... 1,4
28 U.S.C. § 1291 ........................................................ 1

Monograph 109, Supervision of Federal Offenders,
Guide to Judicial Policy, Volume 8, Part E, Chapter 2, Page 8............. 19

## STATEMENT OF JURISDICTION

A grand jury sitting in the Northern District of West Virginia at Clarksburg, West Virginia returned a superseding indictment against Eric Scott Barker ("Barker"), Megan Eileen Dunigan ("Dunigan"), and Robert Allen Hill ("Hill"), charging them with conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §846, §841(b)(1)(c); aiding and abetting the distribution of heroin, in violation of 21 U.S.C. §841(a)(1), §841(b)(1)(c), and 18 U.S.C. §2; and aiding and abetting a drug involved premises, in violation of 21 U.S.C. §856(a)(2) and 18 U.S.C. §2. J.A. 20-23.

Because these charges constitute offenses against the United States, the district court had original jurisdiction pursuant to 18 U.S.C. § 3231. This is an appeal from the final judgments and sentences imposed after defendants entered conditional guilty pleas to count two of the indictment. J.A. 228-248. The United States Court of Appeals for the Fourth Circuit has jurisdiction pursuant to 28 U.S.C. §1291.

## INTRODUCTION

This is an appeal from the denial of motions to suppress evidence obtained from the search of an apartment where Barker, Dunigan and Hill were staying. Barker's probation officer, Vincent Zummo, suspected that Barker violated his supervised release by changing his residence without notifying U.S. Probation. After securing a warrant for Barker's arrest, deputies of the United States Marshal Service, members of a local drug task force, and the chief probation officer for the area traveled to the suspected new residence, where they met Zummo.

Upon their arrival, the Government agents entered the building and learned from the landlord that Barker lived in an apartment on the second floor of the building. Zummo and the chief probation officer remained downstairs, while the remainder of the team proceeded to the second floor, where they arrested Barker in the bathroom of the apartment. During a protective sweep, the arrest team also found Hill and Dunigan in adjoining rooms and took them into custody. Zummo and the chief probation officer were then invited upstairs, where they confirmed that Hill and Dunigan were also on supervised release.

After the Defendants-Appellants were removed from the premises, the task force members and Zummo, without first obtaining a warrant, embarked on a walk-through search of the apartment. During this search, they found drug paraphernalia

2

and packaging material.  They then requested a drug-sniffing dog. Only after the drug dog searched the residence with its handler and alerted did the police obtain a search warrant.  In the subsequent search, the Government secured the narcotics that formed the basis for the federal prosecution that gives rise to this appeal.

## ISSUES PRESENTED FOR REVIEW

I.   **WHETHER, FOLLOWING DEFENDANTS' ARRESTS FOR SUPERVISED RELEASE VIOLATIONS, AND AFTER CONDUCTING A PROTECTIVE SWEEP OF THE RESIDENCE, THE POLICE ACTED ILLEGALLY BY INVITING U.S. PROBATION INTO THE RESIDENCE AND TOGETHER CONDUCTING A WARRANTLESS SEARCH OF THE RESIDENCE?**

II.  **WHETHER U.S. PROBATION ACTED ILLEGALLY IN ORDERING A WARRANTLESS POLICE SEARCH OF THE RESIDENCE WITH A DRUG-SNIFFING DOG?**

III. **WHETHER EVIDENCE SEIZED PURSUANT TO A SUBSEQUENT SEARCH WARRANT SHOULD BE SUPPRESSED BECAUSE THE POLICE WOULD NOT HAVE APPLIED FOR THE SEARCH WARRANT ABSENT FRUITS OF THE EARLIER ILLEGAL SEARCHES?**

## STATEMENT OF THE CASE

Barker, Dunigan and Hill were charged by superseding indictment with conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §846, §841(b)(1)(c); aiding and abetting the distribution of heroin, in violation of 21 U.S.C. §841(a)(1), §841(b)(1)(c), and 18 U.S.C. §2; and aiding and abetting a drug involved premises, in violation of 21 U.S.C. §856(a)(2) and 18 U.S.C. §2. J.A. 20-23.

Defendants moved to suppress evidence seized by the government pursuant to a search of Barker's residence where Dunigan and Hill were staying as well. J.A. 24-37. Theses motions were denied. J.A. 193-227.

Thereafter, defendants entered into conditional guilty pleas to count two of the indictment, thereby preserving their right to appeal the denial of the motions to suppress evidence. J.A. 228-248.

Sentencing took place on October 18, 2013. J.A. 15-16. Barker received a prison sentence of 151 months (as a career offender), to be followed by three years of supervised release. J.A. 15; 401. Dunigan was sentenced to 18 months in prison with three years supervised release. J.A. 16. Hill had a 27 month prison sentence imposed with three years of supervised release to follow. J.A. 16.[1]

The judgment orders entered October 22, 2013. J.A. 16-17. Defendants filed timely notices of appeal thereafter. J.A. 389-393.

A.    Investigation; Warrantless Searches; Application for Search Warrant and Subsequent Search.

As of February 8, 2013, Barker was serving a term of supervised release and suspected of residing at 1103 Phillipi Pike in Clarksburg, West Virginia. J.A. 196. An arrest warrant issued that day against Barker charging violations of supervised

---

[1] All sentences imposed were consecutive to supervised release violation sentences Barker, Dunigan and Hill received at the same time. J.A. 15-16.

5

release conditions, to include failure to provide U.S. Probation with a current residence listing.  J.A. 196.

Barker's probation officer, Vincent Zummo ("Zummo"), traveled to the 1103 Phillipi Pike residence and noticed a silvery-tan Ford Contour parked in front of the house.  J.A. 196-197.[2]  Information was received earlier from a confidential informant that Barker now lived there.  J.A. 197.  Zummo passed his information along to the United States Marshal Service which formed a response team responsible for executing the arrest warrant against Barker.  J.A. 197.  This included four Deputy U.S. Marshals; three members of the local Drug Task Force; and the Chief U.S. Probation Officer. J.A. 197.

The arrest team went directly to that location while Zummo remained outside watching the residence.  J.A. 197.  Only members of the U.S. Marshal Service and the Drug Task Force were involved with entry into the residence to effect the arrest of Barker.  J.A. 159.  The entry team announced their presence, stated they had a warrant for Barker's arrest, and knocked on the front door of the residence.  J.A. 198.   A woman, later identified as Barker's landlord,  opened the door and

---

[2]  Eleven days earlier, on January 29, 2013, police observed the same vehicle driven to a controlled drug buy by a white male.  The vehicle was licensed to Randall Barker, defendant's father, and the police "assumed" the white male seen driving the vehicle was Barker.  J.A. 197-198.

6

indicated "Eric lives upstairs" in a second floor apartment area.  J.A. 198.[3]  The arrest team went to the top of the stairs where they encountered a closed bathroom door, a locked bedroom door just to the left, and an open L-shaped hallway area adjacent to the stairs which led to the kitchen, a second bedroom and the living room.  J.A. 59-60; 141.

Terry Moore, a Deputy U.S. Marshal opened the bathroom door where he saw Barker.  J.A. 60.  Barker was ordered to the ground and immediately handcuffed. J.A. 60.  Moore saw a needle inside the bathroom where Barker was standing, and later located about $1000 in cash from inside Barker's pants pocket. J.A.66.

Moore then assisted other members of the arrest team who forced open the locked bedroom door.  J.A. 61 . Dunigan was found inside. J.A.61.  Moore observed a few pills lying on the top of a dresser.  J.A. 66-67.

A protective sweep of the residence was conducted and Hill was located in the rear bedroom off the hallway.  J.A. 64.  During the protective sweep, the arrest team also observed what it "believed to be packaging for synthetic marijuana" on the kitchen table.  J.A. 67.

---

[3] Zummo and the Chief Probation Officer were ordered to stay downstairs with the landlord while the arrest team went upstairs.  J.A. 64; 159.

7

Importantly, Barker, Dunigan and Hill were each under arrest and in the custody of the arrest team at this point in time. J.A. 91. The protective sweep was already completed. J.A. 64. Moore recognized Dunigan and realized she too was on federal supervised release. J.A. 65. Only then was Zummo ordered by the arrest team to enter Barker's residence. J.A. 64. Once Zummo entered the residence he identified both Dunigan and Hill as being on federal supervised release. J.A. 65. That portion of the arrest team comprised of the U.S. Marshal Service escorted Barker, Dunigan and Hill out of the residence and took them to the United States Courthouse. J.A. 66.

Robert Root with the Drug Task Force confirmed that only after Barker, Dunigan and Hill were arrested and in police custody was Zummo ordered upstairs into the residence. J.A. 92; 161. Thereafter, the task force members and Zummo walked around the residence. J.A.91. This walk-through took place after the protective sweep had ended. J.A. 107. In the living room area they observed paraphernalia and packaging materials. J.A. 91. Only after observing this contraband did Zummo ask the police to contact a canine officer. J.A. 92. About 20 minutes later the canine officer showed up with a drug-sniffing dog . J.A. 92. The dog alerted to multiple areas of the residence. J.A. 92. At that point Root decided to get a search warrant. J.A. 92. It was only after the dog alerted to the

8

presence of drugs that Root decided to obtain a search warrant.  J.A. 96.

The application for a search warrant submitted by Root for Barker's residence is found in its entirety in the record.  J.A. 145-150..  The first three paragraphs of the application outline Root's professional experience and the manner in which the arrest team took Barker, Dunigan and Hill into custody.  J.A. 148.  Until this point in the warrant application, there is no mention of the police observing any contraband.  The warrant application then continues:

> 4.  United States Probation Officer (USPO) Vincent Zummo entered the residence and identified BARKER and the other occupants -- Robert Hill and Megan Dunigan -- as individuals subject to federal supervised release and under USPO supervision.  A search of BAKER's person revealed approximately $1300 in U.S. currency in BARKER's pants pocket.  A brief search of the area where BARKER, Hill and Dunigan were found revealed numerous articles of drug paraphernalia, including but not limited to, capped and uncapped syringes, cotton balls, burnt spoons with white residue, homemade tourniquets and digital scales.  All items recovered were in plain view, with a large amount of needles on the back of the bathroom sink.

> 5.  USPO Zummo requested a narcotics police K-9 to walk through the apartment. TFA Fazzini contacted Clarksburg Police Department K-9 handler, PFC Don Quinn, to respond to the scene to have his K-9 walk through the apartment.  Certified police canine "Quincy" and PFC Quinn performed a "free air" search of the residence after the execution of the arrest warrant.  Quincy showed interest to the odor of an illegal drug in several areas of the apartment, alerting to odor in the restroom area, where the aforementioned drug paraphernalia was located.  Quincy alerted "high," indicating that there was an odor above his reach.  Quincy is certified in finding illegal controlled substances, including: Marijuana, Cocaine/Crack cocaine, Heroin and Methamphetamine.  Quincy first was certified in April 2011 through the WV Police Canine Association, and he is certified every April.

6.  After Quincy alerted to an odor high in the bathroom area, TFA
Rogers pointed his flashlight at the ceiling.  TFA Rogers observed a
ceiling tile out of place and could see a plastic baggie sitting on top
of a "drop ceiling" tile.  At this point, the apartment was secured, and
I contacted the United States Attorney's Office to seek application for
a search warrant.

J.A. 149-150.

The search warrant was subsequently issued and a search of the Phillipi Pike

residence took place.  During the search, the police seized 54 heroin stamps,

baggies of unpackaged heroin, five Hydrocodone pills, eight dosage units of LSD,

11 packs of synthetic marijuana and additional U.S. currency.  J.A. 142.

B.    Suppression Proceedings:

Barker, Hill and Dunigan filed motions to suppress evidence.  J.A. 24-37.

The matter was referred to U.S. Magistrate Judge John S. Kaull, and evidence was

taken April 16, 2013.  J.A. 38-136.  Moore and Root testified for the government.

J.A. 50-123.  Each described the aforementioned arrests of the defendants and the

manner in which the residence was searched by police and probation, and then

again by the canine officer with Quincy, the drug-sniffing dog.  J.A. 50-123.  The

government additionally introduced photographs of the residence and the vehicle

parked outside, a diagram of the upstairs residence, and the search warrant

application.  J.A. 138-141; 145-150.   Barker introduced Root's incident report

10

documenting the entire incident.  J.A. 142-144.

Barker testified he never gave Zummo consent to conduct a home visit or enter his apartment.  J.A. 127.

The magistrate's report and recommendation issued May 13, 2013 .  J.A. 151-178.  The report recommended that defendants' motions to suppress evidence be denied.  J.A. 178.  Defendants filed objections to the report and recommendation in a timely fashion.  J.A. 10; 179-192.

The district court's order adopting the report and recommendation issued June 26, 2013.  J.A. 193-227.  In essence, the district court found that Barker's supervised release status greatly lessened his expectation of privacy such that the police and Probation needed only reasonable suspicion to search the apartment and utilize a drug-sniffing dog.  According to the district court:

> The major difference between this case and Knights is that Barker's conditions of supervised release contain a narrower search provision than the one considered by the Supreme Court in Knights.  There, the probationer agreed to "'[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer.'" Knights, 534 U.S. at 114.  In this case, Barker agreed to "permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband in plain view of the probation officer." See (Case No. 1:04CR86-2, Dkt. No. 114).  Thus, the lone question presented by Barker's objection is whether the particular language in his search provision "upsets the Knights balancing test so as to require more than a reasonable suspicion to justify" a warrantless search of

11

Barker's home.  United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir, 2005).[4]

J.A. 216-217.

The district court found Barker's supervised release condition afforded him a reduced expectation of privacy.  J.A. 217.  Further, the court found "that Barker could not refuse a visit from the probation officer" given the terms of his supervised release condition.  J.A. 218.  As such, "Barker's privacy interest does not outweigh the government's considerable need to oversee the behavior of a supervisee . . . Accordingly, the Court concludes that Zummo and the arrest team needed only reasonable suspicion, and not probable cause or a warrant, to search Barker's apartment."  J.A. 221.  The district court concluded by finding Zummo and the arrest team "had a reasonable suspicion that Barker was engaged in criminal activity when they walked through the apartment after his arrest and summoned the drug dog to Barker's apartment."  J.A. 223.

Finally, assuming an illegal search took place, the district court concluded

---

[4] The district court simply sets up a straw-man argument here through reliance on Yuknavich.  In Yuknavich, the defendant allowed probation officers to enter his residence and he conceded on appeal "the officers had a right to visit him at his house as part of his probation."  419 F.3d at 1309.  Only a probation search of a personal computer inside the home was contested in Yuknavich.  Defendants argue Zummo was not conducting any "home visit" and the entry and  searches were illegal.  As such, Barker's supervised release condition fails to support police and probation actions under a Knights balancing test as better outlined below.

by finding sufficient untainted evidence existed in the search warrant application to support the search. J.A. 223-226. The district court failed to account for the fact that the police acknowledged a search warrant application would never have been requested absent the subsequent search and use of the drug sniffing dog.

      C.    <u>Conditional Guilty Pleas and Sentencing:</u>

Given the district court's ruling regarding the suppression issues, defendants executed conditional guilty plea agreements preserving the right to appeal the issues. J.A. 228-248. Barker entered a conditional guilty plea to count two of the indictment charging aiding and abetting the possession with intent to distribute heroin on July 8, 2013. J.A. 11; 228. Dunigan and Hill entered their conditional guilty pleas to the same count on July 12, 2013. J.A. 249-314.

Sentencing took place on October 18, 2013. J.A. 15-16. Barker received a prison sentence of 151 months (as a career offender), to be followed by three years of supervised release. J.A. 15; 401. Dunigan was sentenced to 18 months in prison with three years supervised release. J.A. 16. Hill had a 27 month prison sentence imposed with three years of supervised release to follow. J.A. 16.

The judgment orders entered October 22, 2013. J.A. 16-17. Defendants filed timely notices of appeal thereafter. J.A. 389-393.

## SUMMARY OF ARGUMENT

This Court must decide if there is any meaningful distinction between a special condition of Barker's supervised release which "permitted a probation officer to visit him" as compared to much broader waivers as found in <u>United States v. Knights</u>, 534 U.S. 112 (2001). Defendants contend the district court failed to acknowledge this important difference and limited its analysis to only whether "reasonable suspicion" existed to support the actions of U.S. Probation and the police. Simply put, a "home visit" condition of supervised release does not allow nonconsensual entry into one's residence and a full blown search.

Moreover, the "home visit" condition of supervised release does not give U.S. Probation unbridled authority to order police into the home with a drug-sniffing dog. The residence is subject to Fourth Amendment privacy protections. The district court erred in its legal conclusion that the "reasonable suspicion" standard supported the action of probation and the police use of the drug-sniffing dog.

Given these deprivations of constitutional rights, the proper analysis is whether the police would have applied for the warrant if the illegal searches did not take place. In this case, the police candidly admitted the results of the probation search and use of the drug dog led directly to the warrant application.

14

## ARGUMENT

I.    **FOLLOWING DEFENDANTS' ARRESTS FOR SUPERVISED RELEASE VIOLATIONS, AND AFTER CONDUCTING A PROTECTIVE SWEEP OF THE RESIDENCE, THE POLICE ACTED ILLEGALLY BY INVITING U.S. PROBATION INTO THE RESIDENCE AND TOGETHER CONDUCTING A WARRANTLESS SEARCH OF THE RESIDENCE.**

### A.    Standard of Review.

In reviewing a district court's ruling on a motion to suppress evidence, this Court reviews findings of fact for clear error and conclusions of law de novo. United States v. Scheetz, 293 F.3d 175, 182 (4th Cir. 2002).

### B.    Argument.

The Supreme Court first addressed the constitutionality of the search of a probationer's home in Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). At issue was the warrantless search of a probationer's apartment by probation officers acting upon a tip. Id. at 870. The search was conducted pursuant to a Wisconsin probation regulation that permitted a probation officer to perform a warrantless search of a probationer's home "as long as his supervisor approves and as long as there are 'reasonable grounds' to believe contraband is present." Id. at 870-71. The Court upheld the search as "'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." Id. at 880. The

15

Court was careful not to imply that warrantless searches of probationers were permissible in the absence of a state regulation that explicitly authorized warrantless searches. Id. at 880.

In United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Supreme Court approved a police search of defendant's residence given a broad condition of probation.[5] At issue in Knights, was whether the Fourth Amendment limits searches pursuant to this probation condition to only those with a "probationary" purpose rather than a traditional police investigation. Id. at 116. The police search in Knights was deemed reasonable "with the probation search condition being a salient circumstance." Id. at 118. As such, the Fourth Amendment required only reasonable suspicion to conduct a search of Knights' home. Id. at 121.

Similarly, in Samson v. California, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), the Supreme Court approved a parolee search absent reasonable suspicion given the broad language of the law at issue. The California law provided that every prisoner eligible for release on state parole "shall agree in

---

[5] Knight's probation order included the following condition: that Knights would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant . .. by any probation officer or law enforcement officer." Id. at 114.

16

writing to be subject to search and seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." <u>Id</u>. at 846.  The Court found that the broad condition of release so diminished or eliminated a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment.  Id. at 856.

A common thread tying <u>Griffin</u>, <u>Knights</u> and <u>Samson</u> together is the specific language of the regulation, condition of supervision, and state law at issue.  In addition, there appears to be a distinction between an individual on parole who still technically serves a prison sentence, albeit in the community, and one simply on probationary supervision.   In each case these legal authorities authorized a warrantless search of the residence.   Defendants' expectation of privacy was diminished given the existence of these very broad authorities.  The broad language of these legal authorities were clearly a  "salient factor" used by the Supreme Court's in affirming the actions of either probation or the police.

In the present case, however, Barker never agreed to a warrantless search condition of his residence by either the police or probation.  Instead, the terms of Barker's supervised release simply required that he "permit a probation officer to visit him or her at any time at home or elsewhere."  J.A. 217.   The district court

17

found Barker's condition of supervised release was a distinction without a difference, such that only reasonable suspicion was required to support the actions of probation and the police. Id. The defendants disagree with this legal finding, as there is clearly a distinction between a "home visit" and a full-blown search of the residence.

Courts have regularly found that a "home visit" is different than a search. The purpose of a home visit is to determine if the probationer is abiding by his probation order. United States v. Sanchez, 608 F.3d 685, 688 (10th Cir. 2010). A properly conducted "home visit" for supervisory probation purposes, however, is not equivalent to a law enforcement or criminal investigatory search. United States v. LeBlanc, 490 F.3d 361, 367 (5th Cir. 2007). A home visit condition does not give authority to search as home visits are meant to be minimally invasive. United States v. Henry, 429 F.3d 603, 617-618. (6th Cir. 2005). The clear distinction between a home visit and a search is best illustrated in United States v. Reyes, 283 F.3d 446, 462 (2nd Cir. 2002), where the court held; "[B]ecause a home visit is far less intrusive that a probation search, probation officers conducting a home visit are not subject to the reasonable suspicion standard applicable to probation searches under Knights."

Even United States Probation notes the distinction between a "home visit"

and a warrantless search. The former is a standard condition of supervised release, while the latter is a special condition applicable only to federal parolees. See: Monograph 109, Supervision of Federal Offenders, <u>Guide to Judicial Policy</u>, Volume 8, Part E, Chapter 2, Page 8.

In the present case, this was no "home visit" to Barker's residence by United States Probation to insure he was abiding by the terms of his supervised release. An arrest warrant had already issued for Barker's alleged violations of supervised release. J.A. 51. Barker's probation officer, Zummo, contacted the U.S. Marshal Service and an arrest team was formulated. J.A. 51. Zummo remained outside watching the residence until the arrest team arrived. J.A. 53. Zummo was not part of the arrest team that entered the house and went to the second floor to locate and arrest Barker. J.A. 64, 159. Barker, Dunigan and Hill were already arrested and in custody, and the protective sweep had been completed while Zummo remained downstairs. J.A. 64. Only then did the police order Zummo to the second floor. J.A. 64. Barker never consented to Zummo entering the residence. J.A. 127. In common parlance, a "home visit" does not equate with a non-consensual, unannounced, warrantless entry into one's residence.[6]  Probation acted illegally

---

[6]  The "home visit" condition in <u>United States v. Henry</u>, 429 F.3d 603 (6th Cir. 2005), is instructive. It allowed probation to simply knock on defendant's front and back doors, and observe for movement and noise from outside the residence when no one answered. <u>Id</u>. at 606.

19

in entering Barker's residence under the guise of the "home visit" condition of supervised release.    The limited condition is a "salient circumstance" under a <u>Griffin</u> analysis that undercuts the validity of the search.  As argued below, the illegality continued unabated as Zummo led the police on a search throughout Barker's residence and later ordered the use of a drug-sniffing dog accompanied by another police officer.

## II.   U.S. PROBATION ACTED ILLEGALLY IN ORDERING A WARRANTLESS POLICE SEARCH OF THE RESIDENCE WITH A DRUG SNIFFING DOG.

### A.    Standard of Review.

In reviewing a district court's ruling on a motion to suppress evidence, this Court reviews findings of fact for clear error and conclusions of law de novo. <u>United States v. Scheetz</u>, 293 F.3d 175, 182 (4th Cir. 2002).

### B.    Argument.

As outlined earlier, the arrest team already had Barker, Dunigan and Hill in custody and the protective sweep was completed before Zummo ever entered the second floor residence. J.A. 64.  It was only after the arrests were made and sweep was completed that Zummo was ordered upstairs.  J.A. 64; 92.  Zummo searched the apartment and "he saw lots of paraphernalia and drug evidence."  J.A. 92.[7]

---

[7] Zummo's search uncovered drug paraphernalia to include: capped and uncapped syringes, cotton balls, burnt spoons with white residue, homemade tourniquets and digital scales.  J.A. 149.

Zummo asked the task force to summon a drug dog. J.A. 92. About 20 minutes later, the drug dog arrived while accompanied by a police officer. J.A. 92; 107-108. The drug dog alerted on multiple areas of the house. J.A. 92. It was only after Zummo's observations and the drug dog alert that the police decided to get a search warrant . J.A. 92; 96.

Defendants contend that Zummo's actions in no way constituted a "home visit." In addition, Zummo had no legal authority to search the residence and order another police officer to enter with a drug-sniffing dog. Both arguments were rejected by the district court based on a finding that Zummo's actions were justified by his reliance on a "reasonable suspicion" standard that Barker and the others were engaged in criminal activity. J.A. 221. This finding misses the mark. As argued earlier, Zummo could not rely on the "home visit" condition of supervised release to enter and search the apartment. In addition, Zummo lacked any legal authority to order a separate police search with a drug-sniffing dog.

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). A warrantless search by police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement. Katz v. United States, 389

U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). There is no crime scene exception to the warrant requirement. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Under most circumstances, use of a drug sniffing dog is not considered a search. United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). However, it is extremely important to recognize that the Place holding does not validate the use of drug detection dogs in all circumstances. If the encounter between the dog and a person or object is achieved by bringing the dog into an area entitled to Fourth Amendment protection, that entry is itself a search subject to constitutional restrictions. United States v. DiCesare, 765 F.2d 890 (9th Cir. 1985)(bringing a canine into an apartment to smell at particular occupant's door is a search); United States v. Whitehead, 849 F.2d 849, 858 (4th Cir. 1988)(when authorities bring a narcotics dog into an area in which the occupant enjoys an expectation of privacy, the fourth amendment extends to protect the owner against "unreasonable" intrusions).

The issue was squarely addressed by the United States Supreme Court last year in Florida v. Jardines, – U.S. –, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). In Jardines, the Court held that law enforcement's use of a drug-sniffing dog on the front porch of a residence, to investigate a marijuana cultivation tip, was a

trespassory invasion of the curtilage which constituted a "search" for Fourth Amendment purposes. The clear directive of <u>Jardines</u> holds true in the instant case. The curtilage was breached by the police using the drug-sniffing, and the search itself occurred inside Barker's residence where Hill and Dunigan were staying as well.

There was no legal justification to support Zummo's order to use a drug-sniffing dog inside Barker's apartment. The district court erred in concluding that such actions were justified solely on a "reasonable suspicion" standard.

### III. EVIDENCE SEIZED PURSUANT TO A SUBSEQUENT SEARCH WARRANT SHOULD BE SUPPRESSED BECAUSE THE POLICE WOULD NOT HAVE APPLIED FOR THE SEARCH WARRANT ABSENT FRUITS OF THE EARLIER ILLEGAL SEARCHES.

#### A. Standard of Review.

In considering a district court's decision regarding a motion to suppress, this Court reviews legal conclusions de novo and factual findings for clear error. <u>United States v. Seidman</u>, 156 F.3d 542, 547 (4th Cir. 1998).

#### B. Argument.

Important to this issue is the candid admission of Root, the task force officer responsible for obtaining the search warrant in this case. Root was asked as follows:

23

Q.    Do you know at what point you decided to seek a search warrant?

A.    With all the paraphernalia that was seen inside the residence, the empty packaging of the synthetic marijuana, and the alert by the drug dog in multiple areas of the residence.  At that point we decided to get a search warrant.

J.A. 92.  Later, Root confirmed the influence of the prior search and use of the drug sniffing dog:

Q.    Who made the decision to apply to the court for a search warrant?

A.    I did.

Q.    And at what point did you make that decision?  Before the drug dog was there and it sniffed, or after the drug dog was there and it sniffed?

A.    It was after.

J.A. 96.

Defendants argued information garnered from the illegal search of the residence and the use of the drug dog clearly influenced the police decision to seek and obtain a search warrant.  J.A. 187.  In other words, the police would not have applied for the search warrant absent the illegal searches.

Rather than squarely address this argument, the district court relied on this Court's holding in United States v. Allen, 631 F.3d 164 (4th Cir. 2011).  In Allen, a police officer, investigating a multiple shooting incident, followed a trail of blood inside defendant's residence where a firearm was located.  Id. at 170.  This Court

24

held that suppression of the firearm was not required because sufficient untainted evidence was presented in the search warrant application to establish probable cause. Id. at 173. Importantly, in Allen, the district court made a finding that the warrant application process was already a foregone conclusion and the illegal entry into the residence was not a contributing factor in any way to the warrant application decision. According to the district court, "clearly you've got a shooting scene there, you've got blood going inside, clearly what you're going to do is get a warrant. And that would have happened, and the gun would have been found." Allen, 631 F.3d at 170.

As such, the Allen case is distinguishable from the facts of the present case. A proper analysis here must focus on what factors influenced the police in applying for the search warrant in the first place. The proper test in determining whether a warrant obtained after an illegal search is tainted is whether the police would have applied for the warrant had they not made prior illegal observations. Murray v. United States, 487 U.S. 533, 537-43, 108 S.Ct. 2529, 101 L.Ed.2s 472 (1988). Two findings must be made to establish that a later search was independent of an earlier unlawful search: "first that officers did not include in their application for a warrant any recitation of their earlier unlawful observations; and second, that they would have sought a warrant even if they had not conducted the unlawful

25

search." United States v. Bullard, 645 F.3d 237, 244 (4th Cir. 2011); United States

v. Swope, 542 F.3d 609 (8th Cir. 2008).

In United States v. Mowatt, 513 F.3d 395, 404 (4th Cir. 2008), this Court

ordered evidence seized pursuant to a search warrant suppressed because the

government failed to establish that no information gained from the illegal search

affected the officers' decision to seek a warrant.  In addition, in such an instance,

the Leon good-faith exception does not apply.[8]  In Mowatt, this Court held:

> The Leon exception does not apply here because Leon only prohibits
> penalizing officers for their good-faith reliance on magistrates'
> probable cause determinations.  Here, the exclusionary rule operates
> to penalize the officers for their violation of [defendant's] rights that
> preceded the magistrate's involvement.

United States v. Mowatt, 513 F.3d at 405.

It was only the illegal search of Barker's apartment and the use of the drug-

sniffing dog that prompted police to obtain a search warrant.  No such process

would have occurred but for the earlier illegalities.  For these reasons, the search

warrant itself is invalid.  Any evidence seized thereafter pursuant to the search

warrant must be suppressed.

---

[8] United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677
(1984).

26

## CONCLUSION

The convictions of Barker, Dunigan and Hill should be vacated and these cases remanded to the district court with appropriate instructions to suppress the physical evidence seized in this case.

## REQUEST FOR ORAL ARGUMENT

Barker, Dunigan and Hill respectfully request oral argument before this Court.

Respectfully submitted,

**ERIC SCOTT BARKER**

By:    s/ Brian J. Kornbrath
        Brian J. Kornbrath
        Federal Public Defender Office
        230 West Pike Street; Suite 360
        Clarksburg, West Virginia 26301
        Tel. (304) 622-3823
        E-Mail Brian_Kornbrath@fd.org

**MEGAN ELLEN DUNIGAN**

By:    s/ Roger D. Curry
        Roger D. Curry
        Curry, Amos and Associates, LC
        P.O. Box 3040
        Fairmont, West Virginia 26555-3040
        Tel. (304) 368-1000
        E-Mail RogerCurry@aol.com

**ROBERT ALLEN HILL**

**By:**   <u>s/ Andrew B. Greenlee</u>
Andrew B. Greenlee
Brownstone Law Firm, P.A.
400 North New York Avenue; Suite 215
Winter Park, Florida 32789
Tel. (407) 388-1900
E-Mail <u>andrew@brownstonelaw.com</u>

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on February 13, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notification of such filing to the following CM/ECF user:

Shawn A. Morgan, Esq.
United States Attorney Office
320 West Pike Street; Room 300
Clarksburg, West Virginia 26301
(304) 623-7030

By:     s/ Brian J. Kornbrath
Brian J. Kornbrath
Federal Public Defender Office
230 West Pike Street; Suite 360
Clarksburg, West Virginia 26302
Tel. (304) 622-3823
E-Mail. Brian_Kornbrath@fd.org